IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 16, 2002

## STATE OF TENNESSEE v. TAMBERLEY LORRAINE DANIELS

**Appeal from the Juvenile Court for Hickman County**
**No. 00-1280C      Samuel H. Smith, Judge**

_____

**No. M2001-00624-COA-R3-JV - Filed October 16, 2002**

_____

The non-custodial parent of two minor girls appeals the decision of the Juvenile Court of Hickman County terminating her parental rights on the grounds of willful abandonment. We affirm the action of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J. and PATRICIA J. COTTRELL, J., joined.

John P. Cauley, Franklin, Tennessee, for the appellant, Tamberley Lorraine Daniels.

Paul G. Summers, Attorney General and Reporter; and Elizabeth, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

### OPINION

Tamberley Daniels married Jeff Carroll in 1986. At the time, Ms. Daniels had one daughter, A., whom Mr. Carroll adopted. C. was afterwards born to the marriage of Jeff Carroll and Tamberley Daniels. In 1991, Ms. Daniels left Mr. Carroll, and the parties were divorced in 1993. Ms. Daniels has not seen A. or C. since she separated from Mr. Carroll in 1991. In January 1993, Ms. Daniels pled guilty to two counts of statutory rape, same being the result of a game of "truth or dare" with a group of teenagers. In May 1993, the Final Decree of Divorce was entered providing that Mr. Carroll was to have custody of A. and C. and that Ms. Daniels was to have no visitation with them.

In September 1998, A. and C. were taken into state custody because they had both been sexually abused by their father, Jeff Carroll. Ms. Daniels first became aware that her children were in state custody when she was sued by the state for child support in June of 1999.

On June 15, 2000, the Department filed a petition to terminate Ms. Daniels' parental rights, Jeff Carroll having already surrendered his parental rights. The case was tried before the Juvenile Court of Hickman County on December 6, 2000, and on January 29, 2001, the trial court entered an Order terminating the parental rights of Tamberley Daniels and making extensive findings of fact and conclusions of law as follows:

> At the time of this hearing on December 6, 2000, [A.] Carroll is fourteen (14) years of age and [C.] Carroll is ten (10) years of age. The proof is undisputed that during the time period from Ms. Daniels' marriage to Mr. Jeff Carroll, the children's biological father, shortly after the birth of [A.] Carroll on May 10, 1986, through these parties' divorce on May 11, 1993, Ms. Daniels not only abused the children, i.e., Mr. Gary Carroll testified that Ms. Daniels had bitten [C.] Carroll which resulted in a referral to and an investigation by the Department at that time, but Ms. Daniels also physically abandoned her children by leaving them in the care of Mr. Carroll and/or the children's paternal grandparents, Gary and Joyce Carroll, for months at a time. It is further undisputed that Ms. Daniels left her husband and her children for the final time during 1991 and has not seen her children since that time. [A.] Carroll was approximately five (5) years old, and [C.] Carroll was approximately eighteen (18) months old. Moreover, it is significant to note that Ms. Daniels voluntarily gave up physical custody of her children and voluntarily agreed to relinquish any and all visitation privileges with her children in the parties' Final Judgment of divorce filed with the Chancery Court of Hickman County, Tennessee, on May 11, 1993. Although said Final Judgment reflects the language "at this time," it is further undisputed that Ms. Daniels has never had a job and in fact has been receiving disability income since 1989. The Final Judgment further provided that inasmuch as Ms. Daniels was unable to provide for her children, no child support was set. It is also significant to note that on January 26, 1993, Ms. Daniels pled guilty to two (2) counts of statutory rape involving other non-related minor children and received a sentence of probation, community service and a requirement to obtain psychological counseling.
>
> In late September, 1998, the Department removed these children from their biological father, Jeff Carroll, as the result of allegations of sexual abuse by Mr. Carroll against the children. The Department in its pleadings alleged that the whereabouts of Ms. Daniels was unknown at the time. Thereafter, in scheduling a Staffing to discuss a Permanency Plan for the children, in October, 1998, the Department's notice to Ms. Daniel's last known address was returned to the Department with the notation "insufficient address." The Department was therefore unable to locate Ms. Daniels. The children were placed in foster care at that time and continue to remain the legal custody of the Department. During July 1999, Ms. Daniels was served with a petition seeking child support by the State of Tennessee due to the fact that her children were in the custody of the Department. Ms. Halbrooks testified that she received her first contact from Ms. Daniels on or about November 30, 1999. Ms. Daniels requested a visit with [A.]. Ms. Halbrooks further

testified that due to the Chancery Court Final Judgment wherein Ms. Daniels did not receive visitation privileges, as well as the fact that Ms. Daniels had pled guilty to statutory rape charges in 1993, and lastly, because Ms. Daniels had not seen her children since 1991, that the Department's position was that Ms. Daniels could not have a visit with [A.] and that Ms. Daniels needed to obtain an attorney. Ms. Halbrooks did ask and receive from Ms. Daniels her current address and phone number; however, Ms. Daniels hung up on Ms. Halbrooks. It was not until April, 2000, that Ms. Daniels again contacted the Department in response to a notification from the Department. During April and May, 2000, Ms. Halbrooks did discuss with Ms. Daniels that if in fact Ms. Daniels was indigent and could not afford an attorney, a procedure existed for Ms. Daniels to ask the Court for an attorney. Ms. Halbrooks forwarded to Ms. Daniels an Affidavit of Indigency and informed Ms. Daniels that she needed to fill it out and take it to the Courthouse in an attempt to obtain a court-appointed attorney. Ms. Daniels did not complete the form and take it to the Courthouse. It was not until the Department filed the Petition to Terminate Parental Rights on June 15, 2000, to which was attached instructions to Ms. Daniels regarding the appointment of an attorney, that Ms. Daniels contacted the undersigned relative to needing an attorney. In response, the Department filed a Motion herein asking the Court to appoint counsel for Ms. Daniels if in fact Ms. Daniels was indigent. The Court first appointed Attorney Dana Dye, but due to a conflict of interest, Ms. Dye could not represent Ms. Daniels. The Court thereafter in July 2000, appointed Ms. Daniels her current attorney, John Cauley, to represent Ms. Daniels in this termination proceeding.

With respect to Ms. Daniels' attempted contacts with her children, Ms. Daniels testified that she has sent birthday cards to her children via Ms. Joyce Carroll and that she had otherwise on occasion sent Christmas presents, but not every year. Further, it was not until April of 2000 that Ms. Daniels became interested in the Foster Care Review Board meetings, several of which she did attend. However, the proof showed that the Board recommended that Ms. Daniels obtain an attorney and that due to the substantial length of time since Ms. Daniels had seen her children, and the fact that the children were having significant emotional and/or psychological problems necessitated not only by the alleged abuse by Jeff Carroll against the children, but also due to the abandonment issues by Ms. Daniels, that it was not in the children's best interest to see their mother. It is further significant to note that on or about April 3, 2000, Jeff Carroll surrendered his parental rights to the children to the Department. Although the Department was aware as early as November, 1999, that Mr. Carroll may surrender his parental rights, nevertheless the Department's goal remained "reunification" to Mr. Carroll until Mr. Carroll surrendered his rights in April of 2000. During this time frame, Ms. Gossett testified that she and her husband had satisfied the prerequisites of becoming foster parents and these children had in fact been placed in their home. The Gossett's had also expressed a desire to adopt these children inasmuch as they had been involved in the children's lives for a substantial number of years, loved these children, and wanted to give these children

a "permanent" home and a sense of belonging and otherwise a sense of security in that their home would be a "final" home. Moreover, both children refer to the Gossett's as "Mom and Dad" and both have expressed a desire to be adopted by the Gossett's. Although [A.] Carroll continues to reside in the Gossett home and is doing fairly well at the present time according to Ms. Gossett and [A.]'s therapist, Miriam Gallager, [C.] Carroll had to be removed from the Gossett home over the summer of 2000 due to continued and substantial problems and in fact is presently hospitalized at Middle Tennessee Mental Health Institute in Nashville, Tennessee, awaiting an involuntary commitment hearing scheduled for December 15, 2000. [C.]'s therapist, Leslie Rice, testified that she had personally recommended a long-term, in-patient commitment/hospitalization due to [C.]'s severe emotional and psychological problems associated both with the alleged abuse by Jeff Carroll, but also with the abandonment issues arising from the fact that [C.] has no concept of what a mother is due to the fact she has not seen her mother since she was a baby and does not remember her mother. Both Ms. Rice and Ms. Gallager testified that neither child should be ordered or forced in any way to see, visit with or have any contact with Ms. Daniels until each child is ready, and that each child should be allowed to initiate any such contact. Moreover, Ms. Gossett testified that she and her family are not vengeful or hostile toward Ms. Daniels, and that if she and her husband are allowed to adopt these children, that she would certainly approve of and facilitate a renewed relationship between these children and their mother when each child was ready and on the condition that each child's therapist approved thereof.

As to Ms. Daniels' current circumstances, she testified that she lives in a two (2) bedroom trailer in Hickman County with her boyfriend/fiance` and that she may be getting married some time in the year 2001. Ms. Daniels further confirmed that her disability income is approximately $500.00 per month and that her monthly bills are approximately $500.00 per month, yet Ms. Daniels testified that she can provide financially for the children. Ms. Daniels has paid no child support for these children due to her disability and limited income and due to the fact that the Chancery Court in the divorce action referenced above did not order that she pay child support. Ms. Daniels testified that the basis for her disability income is a "nerve condition" or a "manic depression" condition, but that she has not taken any medication for same in over a year. Ms. Daniels further testified that she does not have a driver's license nor a vehicle. She also testified that she keeps a loaded gun in her home due to where she lives, implying that same may not be safe. Ms. Daniels further testified that she wants a chance to "raise" her children and that the children need to be given a chance to "just be children." Upon cross-examination by the Guardian ad Litem, Robert H. Lewis, Jr., Ms. Daniels reluctantly conceded that all things considered, we are passed the point of ideally raising these children and expecting the children to just be children, that there were too many unresolved problems and that these children are seriously fragile children.

2. That the Petition to terminate parental rights is well taken and same is hereby granted for the following reason:

(a) Abandonment by said Tamberley Lorraine (Carroll) Daniels as defined in Tennessee Code Annotated 36-1-102 has occurred. Tennessee Code Annotated 36-1-102 (1) (A) (i) defines abandonment as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or make reasonable payments toward the support of the child;

Further, the term abandonment is limited in scope by Tennessee Code Annotated 36-1-102 (G) as follows:

> "Abandonment" and "abandonment of an infant" do not have any other definition except that which is set forth in this section, it being the intent of the general assembly to establish the only grounds for abandonment by statutory definition. Specifically, it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights responsibilities in order for a determination of abandonment to be made. Decisions of any court to the contrary are hereby legislatively overruled.

In light of In re Swanson, 2 S.W. 3d 180 (Tenn. 1999), and Ex Parte Wolfenden, 349 S.W. 2d 713 (Tenn. App. 1959), the factors to consider whether a parent has abandoned a child are: (1) whether a parent had the ability to support a child; (2) the amount of support provided; (3) the extent and nature of the contact between the parent and the child; (4) the frequency of gifts; (5) whether the parent voluntarily relinquished custody of the child; (6) the length of time the child has been separated from the parent; and (7) the home environment and conduct of the parent prior to removal.

3. The Court further finds and adopts the following language from petitioner's Post Trial Brief:

Not only did Ms. Daniels not visit these children for the four (4) preceding months prior to the termination action being filed on June 15, 2000, Ms. Daniels had not, by her own voluntary relinquishment of custody and visitation privileges, even seen her children since the 1993 divorce action, but by her own testimony, she had not seen her children since 1991. To say that the Department's refusal to allow

visitation to Ms. Daniels given the factual circumstances of this case and the fragile condition of these children somehow redeems the conduct of Ms. Daniels over the course of approximately nine (9) years is absurd. Ms. Daniels created the gulf between herself and her children, even to the point of voluntarily relinquishing custody and visitation privileges in 1993. Ms. Daniels is attempting to place blame on the Department for her unfortunate decisions over the course of the entire lives of these children. Such blame for the total lack of any parental involvement and/or responsibility can only be assessed against Ms. Daniels.

Moreover, it is abundantly clear that the best interest of these children rests with Mr. And Ms. Gossett and their love and devotion to these children and the mutual desire by the Gossett's and the children for the Gossett's to adopt these children. T.C.A. Section 36-1-113(i) enumerates a number of factors to be reviewed by the Court in determining whether the proposed termination is in the best interests of these children. In review, termination of Ms. Daniels' parental rights is most definitely in the children's best interest.

Assuming arguendo that the reasonable efforts requirement does apply in this case, and further relates to the Department's obligation to exercise reasonable efforts to reunify children with parents <u>prior to</u> seeking a termination of parental rights, the Department relies upon a number of provisions contained within Title 37 which indicate that reasonable efforts are to be made to reunify children to the home from which they were removed. For example, T.C.A. Section 37-1-170, <u>Joinder of parents in juvenile court actions</u>, provides that if a parent or guardian cannot be found, the Court may proceed with the case without such person. This section goes on to define a parent as including a natural parent "who has sole custody or joint custody." Additionally, in Section 37-1-117, which addresses the Department's obligation to conduct a preliminary hearing in a dependent and neglect case within three (3) days after a child's removal, the exact language provides that "if a child alleged to be dependent and neglected is removed from the custody of such child's parent, guardian or legal custodian. It is contemplated that a non-custodial parent obviously is not afforded the same protection or inclusion into the process as is the custodial parent. In Section 37-1-128(2), which addresses the probable cause standard to be utilized at the preliminary hearing involving an alleged dependent and neglected child, if the court finds probable cause to believe that the child is dependent and neglected, "the court may order that the child be removed from the custody of the child's parent . . ." Even in T.C.A. Section 37-1-166, i.e., the reasonable efforts statute, specifically at 37-1-166 (d) (3), the statute states that whenever the court is making a reasonable effort determination, the court must find, among other things, that the "continuation of the child's custody with the parent or legal custodian is contrary to the best interest of the child." (Emphasis added) Very clearly, these statutes pertaining to removal of children allegedly dependent and neglected apply to the "custodial parent." Ms. Daniels was not even a necessary party. The reasonable efforts analysis, as well as the reunification analysis, overwhelmingly apply to the custodial parent and the home that the child was removed from, not to

the non-custodial parent or the non-custodial parent's home.

Lastly, the Department would further contend that arguably Ms. Daniels was not even afforded the protection of Rule 13(d), Tennessee Rules of the Supreme Court, which provides for the appointment of counsel in dependent and neglect proceedings. More specifically, Rule 13(d) (7) provides that a "party" without counsel should receive advice from the Court that that "party" has the right to be represented and that counsel will be appointed if the "party" is indigent and requests an attorney . . . In cases under Title 37 of Tennessee Code Annotated in which allegations against the parents could result in finding the child dependent and neglected, or in which there is a petition for termination of parental rights. (Emphasis added) Not only was Ms. Daniels not a party to the underlying dependent and neglect proceeding, there were no allegations made against Ms. Daniels in said proceeding. The Department thus distinguishes this case from the dependent and neglect case wherein both parents are custodial parents or legal guardians, or one parent is the custodial parent and the other parent has at a minimum visitation privileges and there exists an on-going relationship between the non-custodial parent and the child or children who have been removed from the custodial parent's home. Ms. Daniels had no custodial rights or visitation rights, by her own voluntary relinquishment of same, for five (5) years prior to the September, 1998, removal of these children from Mr. Carroll's control. Even prior to the 1993 divorce, Ms. Daniels had not even see[n] her children, again voluntarily, although she had equal rights to them with Mr. Carroll, for two (2) years approximately. The Department contends that it has not violated any due process rights that Ms. Daniels may assert that she had when these children were removed from Mr. Carroll in 1998, nor has the Department failed to exercise reasonable efforts to reunify these children with Ms. Daniels inasmuch as the reasonable efforts statute plainly states that reasonable efforts are to be made to reunify the child into the home from which the child was removed, i.e., the custodial parent's home. Moreover, the ASFA reasonable efforts statute and the Tennessee counterpart both place the safety of the children as the "paramount" concern. Very clearly, these children could not simply "visit" with their mother when Ms. Daniels contacted the Department in November of 1999.

3. The Court further finds by clear and convincing evidence that the respondent, Tamberley Lo[r]raine (Carroll) Daniels, has abandoned her children in accordance with the Tennessee statutes provided.

4. The Court further finds by clear and convincing evidence that the termination of her rights is in the best interest of the children.

5. The Court further finds by clear and convincing evidence that Ms. Daniels has failed without good cause or excuse to make reasonable and consistent payments of child support and failed to seek reasonable visitation with the children.

6. The Court further finds by clear and convincing evidence that placing custody of the children in the legal and physical custody of said Tamberley Lorraine (Carroll) Daniels would pose a risk of substantial harm to the physical and psychological welfare of the children.

7. The Court further finds that the Department of Children's Services have made reasonable efforts in all matters herein.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that the parental rights of Tamberley Lorraine (Carroll) Daniels with regard to the minor children, namely, [A.] Carroll, date of birth 5/10/86, and [C.] Carroll, date of birth 2/13/90, is hereby terminated.

IT IS FURTHER ORDERED that the said children be placed in the temporary custody of Davy and Michelle Gossett who reside in Hickman County and the State may proceed with the adoption of said children.

IT IS FURTHER ORDERED that cost is taxed to the Petitioner for which execution may enter.

This case comes before the appellate courts with a recognition that parents have a fundamental right to the care, custody and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). This right is not absolute, and parental rights may be terminated if the court determines that statutory grounds exist for such termination and that such termination is in the best interest of the children. Both the grounds for termination and a finding of the best interests of the children must be established by clear and convincing evidence. This is evidence which "eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence." *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995).

The case comes before the Court of Appeals, *de novo,* upon the record with a presumption of correctness of the trial court under T.R.A.P. Rule 13(d), augmented by the necessity of this Court finding, in accord with the clear, cogent and convincing evidence standard, that the appellee has carried the burden of proof, that it is "highly probable" that the evidence establishes grounds for termination, and that such termination is in the best interests of the children. *Estate of Acuff v. O'Linger*, 56 S.W.3d 527, 534-37 (Tenn. Ct. App. 2001).

It is difficult to imagine more egregious circumstances, or more tragic results, than those inflicted upon A. and C. in this case. When one was of pre-school age and the other an infant in 1991, their mother simply disappeared from their lives leaving them in the custody of their father. Two years later, without ever seeing the children and having been convicted of two counts of statutory rape involving two teenage boys, she was stripped of all rights even to visit with A. and C. They were left to the tender mercies of Jeff Carroll, their father, who sexually abused both of them until they were finally rescued in September of 1998 by the Department of Children's Services.

Not surprisingly, the Department inherited two very troubled young girls who required in-patient psychiatric hospitalization for being suicidal and, in the case of C., suicidal and homicidal. Their aunt and uncle, Michelle and David Gossett, have struggled valiantly as foster parents. The tragedy is magnified by the fact that A. is apparently a well motivated young lady, maintaining an academic A and B average in school in spite of her serious psychological problems, which have been exhibited through suicidal and self-injurious behavior that her therapist, Miriam Gallaher, asserts is

a result of loss of self esteem related to abandonment by her mother and father. C. is in much worse condition, having gone through a long series of foster care placements and repeated in-patient psychiatric hospitalizations.

Michelle and David Gossett still wish to adopt A. and C., though they were compelled to ask the Department of Children's Services to hospitalize C.  She remained hospitalized at the time of the trial of this case.

From the time she left her children in 1991 until she was sued by the State of Tennessee for child support in June of 1999, Ms. Daniels had no contact whatsoever with her children and was not even aware that they were in state custody.  Five months after she was sued for child support, Ms. Daniels contacted the Department of Children's Services to inquire about visiting with A.  Based upon the children's fragile emotional state, the divorce decree and the fact that Ms. Daniels had not seen her children in eight years, the Department informed Ms. Daniels on December 1, 1999, that she would not be allowed to visit A. and suggested that she get an attorney.

In Tennessee, a court may terminate parental rights when a parent has "abandoned" a child as defined in Tenn. Code Ann. § 36-1-102. Tenn. Code Ann. § 36-1-113(g)(1). Tenn. Code Ann. § 36-1-102(1) defines abandonment to occur when:

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption,  that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or make reasonable payments toward the support of the child;
> . . . .
> (B) For purposes of this subdivision (1), "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means;
> (C) For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child;
> (D) For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means that, for a period of four (4) consecutive months, no monetary support was paid or that the amount of support paid is token support;
> (E) For purposes of this subdivision (1), "willfully failed to visit" means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation;
> (F) Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship

rights or seeking the adoption of a child; and

(G) "Abandonment" and "abandonment of an infant" do not have any other definition except that which is set forth in this section, it being the intent of the general assembly to establish the only grounds for abandonment by statutory definition. Specifically, it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made. Decisions of any court to the contrary are hereby legislatively overruled;

Tenn. Code Ann. § 36-1-102(1)(A)(i), (B-G)(2001).

In 1999, the Tennessee Supreme Court found the definition of "willfully failed to support" contained in Tenn. Code Ann. § 36-1-102(1)(D) unconstitutional. *In re: Swanson*, 2 S.W.3d 180 (Tenn. 1999). However, the *Swanson* decision affected only the portion of the statute that defined failure to support and explicitly left the rest of the statute intact, including the grounds for, and definition of, abandonment based on the failure to visit. *Swanson*, 2 S.W.3d at 189. "The effect of the Court's decision [in *Swanson*] was to restore the definition of abandonment as it [had] existed before the 1995 amendment, with the element of intent intact." *In re Menard*, 29 S.W.3d 870, 874 (Tenn. Ct. App. 2000).

While Ms. Daniels' income through the years, and specifically in the last four months preceding the filing of the petition to terminate her parental rights, was limited, it is the same income that she now asserts would be sufficient for her to support her children if she could just get them back. The statute relative to abandonment does not require court ordered support, but rather willful failure to make reasonable payments toward the support of children. Reasonable payments, of course, depend upon the ability of the parent to pay support. However, the record shows, by Ms. Daniels' own assertion, that she had the ability to make some payments toward the support of the children in the four months preceding the filing of the petition for termination and did not do so. Such failure was both willful and intentional without resort to the constitutionally flawed 1995 amendment to the statute condemned in *Swanson*.

Ms. Daniels' belated efforts, after the damage had already been done by over eight years of deliberate desertion of her children, will not suffice, as "visitation within the meaning of T.C.A. § 36-1-102(1)(A)(i)." The trial court correctly held that clear, cogent and convincing evidence establishes abandonment of the children by Ms. Daniels.

Once the grounds of abandonment were established to terminate the parental rights of Ms. Daniels, the best interest of the children under the record in this case is obvious to the point of being near indisputable. We simply adopt the findings of the trial court in this respect with these additional observations. These children have been through enough because of the willful disregard of their interests and welfare by both of their parents and the aggressive sexual abuse of their own father. The great damage to them has already been done and may never be undone. At least as to A., there appears to be a glimmer of hope. Only despair is evident at this time as to C. Their one real chance

of salvaging anything in life appears to rest in the continued love, support and care of Michelle and David Gossett, with the continued assistance of the Department of Children's Services.

The evidence is overwhelming - - well beyond the clear, cogent and convincing standard - - that termination of the parental rights of Ms. Daniels is in the best interests of A. and C.

The judgment of the trial court is in all respects affirmed, and the case is remanded for such proceedings as may be in the best interests of A. and C.

Costs are assessed against Ms. Daniels.

_____
WILLIAM B. CAIN, JUDGE